### JASLOW v. WATERBURY CO.

(Circuit Court of Appeals, Second Circuit. November 2, 1925.)

#### No. 54.

1. **Sales ☞172—Seller's attempt to procure permits from British government held not to relieve buyer and his assignees of responsibility of procuring it.**

Where contract for sale of rope during the war contemplated no shipment without permit from British government, and placed responsibility for securing permit on buyer and his assignees, *held*, that seller's attempt to obtain permit did not relieve buyer and its assignees from responsibility of obtaining permit.

2. **Sales ☞172—Seller held not required to deliver goods at dock, where shipping permit was refused.**

Where seller was directed by buyer or his assignees not to ship goods during the war without permit from British government, seller was not obliged to deliver goods at dock where British government refused permit.

3. **Sales ☞172—Delay held to warrant rescission by seller.**

Contract for sale of rope, contemplating delivery and shipment only on obtaining shipping permit from British government, need not be performed by seller, where purchaser failed from November 14, 1916, until June 29, 1917, to obtain permit; such delay being unreasonable.

In Error to the District Court of the United States for the Southern District of New York.

Action by Joseph Jaslow against the Waterbury Company for breach of contract. Judgment for defendant, and plaintiff brings error. Affirmed.

Davies, Auerbach & Cornell, of New York City (George T. Hogg, of New York City, of counsel), for plaintiff in error.

Marsh & Wever, of New York City (Charles Capron Marsh and Rolph T. Marsh, both of New York City, of counsel), for defendant in error.

Before ROGERS, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. The assignor of the plaintiff in error, one Spieler of Malmo, Sweden, on March 23, 1916, made inquiries of the defendant in error concerning the purchase of 100 tons of second grade rope. He received a price for the rope and on the next day the defendant in error wrote to him offering the rope "for your customer f. a. s. New York or Brooklyn docks." The letter contained the phrase: "The responsibility of shipping must rest with the buyer after we make delivery to steamer dock." Thereupon Spieler wrote to his customer, offering the rope at increased prices. The letter expressly stipulated that no order for the shipment could be executed unless there was forwarded with the order a shipping permit and other necessary papers to obtain the approval of the British authorities. It stated: "We could make shipment of these goods in about 90 days from date of receiving British approval here in New York." On April 18, 1916, Spieler's customer accepted the offer and thereupon renewed his negotiations with the defendant in error for the purchase of

the rope, and after such negotiations wrote the defendant in error, stating:

"Referring to conversation of this morning with you and your Mr. Waterbury, regarding our order of Herman Gotthardt, Malmo, Sweden, for 100 tons of your 'Rex' Manila rope, upon which, under date of March 24, 1916, you quoted us a price of 15¢ per lb., allowing us 2½ per cent. as commission, we have yesterday received from Mr. Gotthardt an acceptance of this offer, to which we had added .37½¢, naming them a price of 15.37½¢ per lb. f. o. b. New York in our letter to him of March 30th, which is the selling price to him, and you will please allow us the additional sum when making remittance to us."

The defendant in error wrote and cabled Gotthardt: "We accept your orders thirty and thirty-one through Abraham Spieler, your New York agent." Spieler wrote Gotthardt, in which letter he stated that he had passed the order to the Waterbury Company, and that it would execute the order, but they first wanted confirmation, and he requested them to confirm the order. Thereupon Gotthardt cabled defendant in error, "Confirm my bargain one hundred tons Manila basis price letter April 18," and wrote that:

"In order to obtain a shipping permit I beg to address yourselves to Messrs. Furness, Withy & Co., 32 Broadway, New York, the agents for the Swedish-American Line in Gothenburg, with whose steamers I mean it is best to ship the goods, as they are going direct to Gothenburg from New York."

It is thus clear, as the facts appear upon this trial, that the defendant in error accepted Gotthardt as a buyer of the rope from it upon the terms stated to Spieler, and in turn conveyed by him to the ultimate customer. Gotthardt confirmed the bargain, which he referred to as "my bargain" in his cablegram. Thereafter 15 tons of the rope were shipped to the corporation known as Aktiebolaget German Gotthardt, to which Gotthardt had assigned his contract. On November 14, 1916, after this shipment, the Gotthardt corporation cabled, "Ship remainder first opportunity provided shipping permit obtained insure against capture confirm wireless," to which the defendant in error sent a cable that insurance against capture was unobtainable and stated that if the Gotthardt corporation would open with "bankers confirmed credit in New York payment as delivered f. a. s. vessel New York you assuming all risks will send balance rope against permits issued freight insurance all shipping charges your

account otherwise ask cancellation order." Gotthardt did not reply, but assigned its contract to another Swedish corporation, and sent a cable to Spieler, which was forwarded to the defendant in error and read as follows:

"Instruct Waterbury Co. to obtain shipping permit for balance manila rope to Aktiebolaget Bachmans Repvaruafar Malmo; we guarantee payment when shipping documents presented here."

Thereafter on January 7, 1917, the Bachmans company wrote the defendant in error that it had taken over from the Gotthardt corporation the latter's purchase of about 85 tons of manila rope, and asked the defendant in error to ship the rope as soon as possible on Swedish steamers in three or four different lots, and that it would pay for the goods as soon as the shipping documents were presented through any bank or bankers at Malmo, Sweden, but on no account must the goods be shipped without shipping permit being first obtained. The defendant in error tried unsuccessfully to secure a permit from the British authorities for Gotthardt. It applied for a permit for the Bachmans company, but the British authorities refused to issue one. There is sufficient proof to support the position of the defendant in error that it did apply for and failed in obtaining this permit. The proof also establishes that Gotthardt had been blacklisted by the British government under date of November 10, 1916, and such blacklisting applied to any assignee of Gotthardt.

After failing thus to secure the permit, the defendant in error on February 1, 1917, wrote the Bachmans company advising it that for this reason it would cancel the contract. Copies of this letter were sent to Spieler and the Gotthardt corporation. Spieler received his copy and thereafter employed an attorney to look after his interest and the interest which he represented—the Gotthardt corporation and the Bachmans company. Thereafter there was considerable negotiation looking toward the fulfillment of the contract, but neither Spieler nor his assignees were able to secure the permit.

On April 16, 1917, the Gotthardt and Bachmans corporations assigned the contract to Spieler. Having acquired the contract, and after a delay of two months, Spieler, through his attorney, on June 29, 1917, made demand for deliveries "here in New York City." On July 19, the defendant in error wrote Spieler's attorney, inclosing a copy of the letter of rescission and advising Spieler's

attorney that now it did not consider that there is an existing contract. It is apparent that Spieler obtained an assignment of the contract with full knowledge of the inability to obtain the permit and the defaults of his assignors in so doing. He took the contract, knowing full well the position of the defendant in error. Thereafter Spieler, Gotthardt, the Gotthardt corporation, and the Bachmans company joined in an assignment to the plaintiff in error, who instituted the present action.

The theory of this action is that there was a breach of contract by nondelivery of the rope under the terms of the contract of purchase. The case was here before, and the opinion then delivered is found in 296 F. 363. We there reversed a judgment for the plaintiff and ordered a new trial. On the new trial the learned District Judge held that the testimony was substantially the same, and that the opinion which we delivered on the former appeal required his directing a verdict for the defendant in error, which he did.

On this writ of error, it is contended that "the situation is the reverse from what it was when the case was here previously before this court," and it is argued that it was established that the British letter of assurance could have been obtained within a reasonable time before shipment and for months thereafter; that the defendant in error agreed to obtain it and make prompt shipment, but deliberately delayed doing so. It is said that the time for shipment expired on September 17, 1916. It is argued that Gotthardt's confirmation was received on June 19, 1916, and that within 90 days the shipment should have been made. This alleged breach by nondelivery assumes that the defendant in error was obligated to obtain the British letter of assurance. From the documentary proof, it is clear that the responsibility of shipping rested upon the buyers and the delivery requirement of the defendant in error was to make delivery to the steamer's dock. This was the stipulation that Spieler made in his letter to Gotthardt when he offered to sell to him. Gotthardt, after the deal was closed, wrote the defendant in error to the effect that he was going to insure the goods against sea and war risk.

[1] On this trial the evidence of the first trial was somewhat supplemented. Spieler testified: That he had a conversation with the sales manager of the defendant in error before the shipment of the rope, and in that conversation the sales manager told him that they had obtained authority and were going to make the shipment, and asked him to advise Gotthardt that they were going to take out the insurance. This was on July 18, 1916. That on October 12, 1916, after the shipment of 15 tons, he asked the sales manager to prepare and ship the balance of the rope as quickly as possible, and the sales manager replied that the defendant in error was not going to manufacture any more rope until the 15 tons had been accepted and paid for. On cross-examination, he testified that the representative of the defendant in error never said any different than that the responsibility of shipping must rest with the buyer after they had made delivery to the steamer dock. The contract between the parties placed the responsibility and the duty on the plaintiff in error and his assignors to obtain or cause to be obtained the necessary shipping permit. What the defendant in error did in assisting or attempting to obtain the permit in no way relieved the buyer or his assignors of the responsibility of obtaining the permit. Assistance of this character was not an assumption of such obligation.

[2] Apparently at no time after the first shipment was made was it possible to obtain this British permit and therefore the defendant in error was never in a position to do more than to make delivery at the ship's dock. No difficulty was experienced in obtaining the permit for the first 15 tons in the summer of 1916. The application therefor was made in July, but the shipment did not go forward until September, 1916. There is no criticism of the defendant in error not shipping the balance prior to November, 1916. Permits could not be obtained after November, 1916. It was not possible to obtain the permit for 100 tons when the 15 tons were shipped unless the entire 100 tons were shipped in one lot and on that vessel. The permit had to name the ship and describe the goods, and it was understood from the beginning that the 100 tons were not to be shipped as one lot, but were to go forward in small carload lots. The direction for shipment from the Gotthardt corporation and the Bachmans company expressly directed the defendant in error to ship the goods in three or four different lots. There could be no default in the delivery after November 14, 1916, when the assignor of the plaintiff in error advised the defendant in error not to ship unless the British Admiralty gave a permit. After that day they would not give a permit; therefore the ship would not accept the goods and the defendant in error was not obliged to deliver goods at the steamer dock under the circumstances.

[3] The assignors of the plaintiff in error were in default on February 1, 1917. At the time of the assignment to Spieler by Gotthardt and Bachmans corporations, there was no contract right of recovery against the defendant in error to be assigned. On June 29, 1917, when demand was made by Spieler for the delivery in New York City of the rope, there had been such unreasonable delay—from November 14, 1916, until June 29, 1917—that, even if the shipping permit had been available then, the defendant in error was excused from performance. Earnshaw v. United States, 146 U. S. 60, 13 S. Ct. 14, 36 L. Ed. 887; Jaslow v. Waterbury (C. C. A.) 296 F. 363; Edwards Mfg. Co. v. Bradford Co. (C. C. A.) 294 F. 176.

We have examined the other errors assigned, where claim is made that error was committed in the admission and exclusion of evidence, but we find no force in the arguments advanced.

Judgment affirmed.